IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )
                                     )
v.                                   )      No. 3:05-CR-39
                                     )      (PHILLIPS/SHIRLEY)
WILLIAM WRIGHT,                      )
                                     )
            Defendant.               )

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to

28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the

District Court as may be appropriate. This matter comes before the Court upon the defendant's

Motion to Suppress Evidence [Doc. 13], filed on June 1, 2005. The parties came before the

Court for a suppression hearing on June 30, 2005. The government was represented by Assistant

United States Attorney Steven H. Cook, and the defendant was represented by Assistant Federal

Defender Jonathan Moffatt. The defendant was also present. At the conclusion of the hearing,

the defendant asked to file a post-hearing brief. The Court granted this request, and the

defendant filed a supplemental brief [Doc. 20] on July 8, 2005. The government did not file a

supplemental response. Accordingly, the Court took the suppression motion and related filings

under advisement on July 9, 2005.

The defendant is charged [Doc. 1] in a three-count indictment alleging that on

January 12, 2005, the defendant was a convicted felon in possession of .380 caliber ammunition

(count one), a Bryco model 48 .380 caliber semiautomatic pistol (count two), and a Zastava SKS

7.62 semiautomatic rifle and 7.62 x 39 caliber ammunition (count three). The defendant

challenges [Docs. 13 and 20] the January 12, 2005 stop of the car he was driving as violating his

rights under the Fourth Amendment because (1) the officer lacked probable cause to stop him,

having witnessed no traffic violations; (2) the officer did not have reasonable suspicion that

criminal activity was afoot; (3) the defendant did not voluntarily consent to the search of his car,

and (4) the officer's questioning of him was unwarned and went beyond the scope of a traffic

investigation. The government responds [Doc. 16] that the officer properly stopped the

defendant and searched his car and that the <u>Miranda</u> warnings were not required because the

defendant was not in custody.

## SUMMARY OF TESTIMONY

Testimony for the government was limited to that of Knoxville Police Department

Patrolman Ray Offenbacher. Officer Offenbacher testified that he has been with the patrol division

for ten (10) years and generally patrols the East District, Beat 55, which includes Asheville

Highway, Rutledge Pike, Interstate 40 to Midway, Strawberry Plains, and Magnolia Avenue. On

January 12, 2005 at 4:26 a.m., he was on patrol in a marked police car in the twenty-seven hundred

block of Magnolia Avenue. This area is located a few blocks east of Cherry Street between Harrison

and Hembree Streets. He stated that this is a high crime area known for drugs and prostitution and

is also part of the Project Safe Neighborhood area due to the high incidence of violent crime,

particularly gun crimes.

Officer Offenbacher testified that he parked by the side of Lakewood Apartments

(2730 Magnolia Avenue), which is also known as "Krystal Heights" because it is across the street

from the Krystal Restaurant. Officer Offenbacher said that it was a cold, dreary, rainy morning and

that he saw a white female walk from the apartment building and get into the passenger side of a car in the parking lot. From his location on Magnolia, he saw the car drive through the parking lot and to the rear of the building without its lights illuminated. He said that the alleyway to which the car drove could not be seen from Magnolia.

Officer Offenbacher testified that he drove around the corner onto Hembree and turned his lights off. He said he saw the car, which he had been watching, stopped directly behind the apartment building and observed the white female, whom he had seen earlier, exit the car and open its trunk. He then saw a black male carrying a long, tubular bundle, which looked like a rifle. The black male approach the open trunk and put the bundle inside. Officer Offenbacher said, at that point, he turned on his headlights and turned into the alley. The white female closed the trunk and got back into the car. The black male started walking away from the car.

The officer said he then observed the car proceed up the alley, which is a public alley with posted speed limit signs. The vehicle initially proceeded up the alley a short distance with its lights off and then turned them on. He estimated that the car went twenty (20) to thirty (30) feet before the lights were illuminated. The officer followed the vehicle up the alley to Harrison Street, at which time the vehicle turned left or south onto Harrison. Officer Offenbacher followed the car to Linden Avenue. Once he crossed Linden, the officer activated his blue lights and stopped the vehicle.

Officer Offenbacher testified that immediately upon stopping, the driver's side door of the car opened, and the defendant extended his hand outside while holding his wallet or some object. The officer instructed him to stay in the car and radioed for backup. The officer testified

3

that his patrol car was equipped with video equipment. The videotaped footage from the morning in question was admitted as Exhibit 1 without objection.

The officer further testified that after he instructed the defendant to remain in the car, he approached the driver's side and asked for the defendant's driver's license and registration, both of which the defendant provided. He noted that the license tags on the vehicle were Florida tags, while the defendant produced a Tennessee driver's license. He stated that the defendant told him that the address on his driver's license was correct and that he lived at the Green Hills Apartments. The officer asked the defendant what the black male had put in the trunk, and the defendant told him it was a rifle. He then asked whether the defendant had any weapons on him and was advised that the defendant did not. He asked the defendant to get out of the car and patted him down. During the pat down, he felt several hard, short, circular objects in the defendant's front pocket. Officer Offenbacher believed the items were ammunition but said they felt too short to be for a rifle. He removed these "rounds" from the defendant's pocket, and they turned out to be .380-caliber rounds, which are not consistent with a rifle. He handed the rounds to his backup officer, Officer Rob Taylor, who had arrived by that time. Officer Offenbacher asked the defendant about the ammunition, and the defendant told him that it went to a handgun at his residence.

Officer Offenbacher testified that he asked Wright if he could look at the rifle, to which Mr. Wright responded by asking why he wanted to do that. The officer then asked the defendant if he knew the person who had put the rifle in the car. The defendant identified the person as "G." In response to further questioning, the defendant denied knowing from where the rifle came or who owned it. The officer then asked the defendant if the gun was stolen, and the defendant said no. The officer asked if he could check the serial number on the rifle in order to determine whether

4

it was stolen, and the defendant said he could look at the numbers. At this time, the officer secured Mr. Wright in his patrol car. The officer said the female was still in the defendant's car and was moving around.

Officer Offenbacher testified that in addition to the traffic violation, he was investigating potential weapons, burglary, and drug offenses.[1] With regard to burglary, the officer said his suspicions were aroused because the car had pulled to the rear of the apartment building. He also noted that the rifle could have been taken from one of the other cars in the parking lot of the apartments. He testified that it is "semi-common"[2] for burglars to possess firearms and that they do so approximately fifty percent (50%) of the time. He related that it is also common for burglars to steal firearms. He also believed that drugs could have been involved because of the neighborhood being a high-crime area and because drugs are consistent with the presence of guns.

The officer testified that after placing the defendant in his police car, he asked the female to get out of the car and patted her down for weapons. He said he found a razor blade-like item in her pocket. He asked the female to step back beside the patrol car, and he opened the trunk of the stopped vehicle to get the serial number off the rifle. Inside the trunk, he found an SKS assault rifle, which was loaded with approximately eleven (11) rounds and had the bolt back ready to fire. It also had a bayonet attached. During an NCIC check, it was determined that the rifle was not stolen.

---

[1]The Court notes that much of the testimony regarding the crimes that the officer was investigating stemmed from leading questions by the prosecutor.

[2]The transcript [Doc. 19, p.18] states that the officer said "semicolon." Because this is inconsistent with the Court's notes as well as the context of the testimony, the Court finds that the officer said "semi-common," rather than "semicolon."

5

Officer Offenbacher testified that while he was looking in the trunk, Officer Taylor was searching the car's "cargo, passenger compartment." He said that Taylor found a .380 caliber handgun in the console of the car and that this handgun matched the ammunition found in the defendant's pocket. The officer stated that Mr. Wright had previously told him that Wright was going to use the rifle to hunt. Upon seeing the assault rifle, which is not commonly used for hunting animals, Officer Offenbacher returned to his patrol car and asked the defendant what he was going to hunt. The defendant said anything that he happened to see at a ranch, to which he was going. The officer informed the defendant that hunting season was over and that he could get in trouble for hunting out of season. Officer Offenbacher stated that he did not inform the defendant that he was under arrest until 4:51 a.m. He also noted that while detained in the patrol car and prior to being told that he was under arrest, the defendant indicated that the officer could take his guns and that he would simply pick them up in the morning or the police could keep them if they were stolen.

The government played Exhibit 1, which revealed a date of January 12, 2005, and a 4:26 a.m. start time. As the videotape was played, Officer Offenbacher testified about the events it depicts. The videotape shows Officer Offenbacher driving on Magnolia, sitting in front of the apartments on Magnolia, and facing eastbound at 4:27 a.m. Just before 4:28 a.m., he starts driving and turns into an alley, which he identifies as the alley behind the apartment building. In the alley, the rear lights of a car are visible. A black male is seen walking away to the right, and a women walking to the passenger side of the car. Officer Offenbacher testified that he saw an item obviously being loaded and that he had seen the black male carrying what he believed was a rifle from the parking lot toward the area to which the car had driven. He identified the black male as "G."

6

The videotape depicts that the subject car begins driving down the alley without its headlights illuminated. After about two seconds, the lights are turned on and about 4:28:30 a.m., the subject car turns left onto Harrison. After turning onto Harrison, the officer activates his emergency lights to signal the car to stop. At 4:29 a.m., the car door is open, and at 4:29:27 a.m., "M2" appears on the screen, indicating that Officer Offenbacher's outside microphone is activated. At this point, the officer approaches and asks for license and registration. At 4:29:52 a.m., Officer Taylor arrives. Officer Offenbacher testified that he and Taylor are the only officers conducting the stop.

The videotape reveals that Officer Offenbacher asked Defendant Wright if the address on his driver's license is correct and if he lives in Green Hills. He also asked him what brought him up to the apartments. The defendant told Offenbacher that he was visiting his sister and that his passenger was a friend. The officer then asked the defendant what the guy put in his trunk, and Mr. Wright initially said that the person did not throw anything in his trunk and then said that it was a hunting rifle. He also asked the defendant why he pulled behind the apartment building to get it. Mr. Wright stated that he was asked to do that. Offenbacher then asked if the defendant had any weapons on him, which Mr. Wright denied. The officer asked Wright to step out of the car.

The videotape shows that at 4:31:15 a.m., Officer Offenbacher frisked the defendant. Offenbacher testified that he was patting the defendant down to search for weapons. At that time, the officer felt the bullets. The videotape reveals that Mr. Wright subsequently states that he hoped to go hunting with the rifle. At 4:31:47 a.m., the female passenger is told to stop moving around inside the car and to put her hands on the dash. Offenbacher testified that he was concerned that she might attempt to shoot them with a weapon from inside the car. The videotape shows that at this

7

point, the Officer Taylor is looking in the car through the open driver's side door. Officer Offenbacher asks the defendant about the person who loaded the gun and then asks the defendant if he has any problems with the officer pulling out and looking at the rifle. The defendant inquires why. Offenbacher replies to check whether the rifle is stolen. The defendant says that he does not care if the officer reads the numbers on the rifle. Offenbacher asks if the defendant is a convicted felon, and the defendant says that he is not.

The videotape reveals that at 4:32:54 a.m., Officer Offenbacher puts the defendant in the police car. At this point, the officers talk to each other with Offenbacher giving Taylor an update as to what he had seen. At 4:33:40 a.m., the passenger, "Danielle," gets out of the passenger side, is questioned regarding whether she has any weapons, and indicates that she has a little razor blade. The officers frisk her and remove the blade. Offenbacher also asks her if she has any drugs and whether she smokes crack or does drugs. She is then asked to tell them about the rifle that was put in the trunk. The passenger says that she was just getting a ride home and was told to open the trunk.

The videotape shows Officer Offenbacher opening the trunk with the keys. At 4:35:32 a.m., he says that he has found an "SKS." Offenbacher testified that the rifle was wrapped in a brown rifle case. He said that he initially believed it to be a rifle upon first seeing it being carried to the car because of the manner in which "G" was carrying it. The videotape depicts that at 4:36:15 a.m., Offenbacher radios the rifle's serial number, which is 417840 and was located on the stock, to records to see if the rifle is stolen. At this point, Officer Taylor begins searching the passenger compartment, and at 4:39:32 a.m., Taylor is examining the rear seat and passenger side

8

of the car. During this time, Offenbacher requests a history check on the defendant and radios his driver's license number to records.

The videotape reveals that at 4:39:35 a.m., Officer Offenbacher questions the defendant about what he was planning to do with the gun. The defendant states that he is going hunting with some friends on a big ranch. The officer then asks the defendant if it is a common practice to have someone throw a gun in his car trunk. He notes that the rifle is loaded. Offenbacher asks about the gun relating to the ammunition found in the defendant's pocket. Wright says that the ammunition in his pocket is for his gun at his residence. At 4:40:43 a.m., the defendant says that the person who put the gun in the trunk is called "G." Officer Offenbacher testified that the answers the defendant was giving him at this point in the videotape were furthering his suspicions. The videotape shows that at 4:41:25 a.m., Officer Taylor says, "I found it." Offenbacher looks into the car and remarks that the gun is in an obvious place. Taylor comments that the car's console was the last place he looked. Offenbacher testified that Taylor had found a loaded .380 caliber handgun in the console of the car. The videotape reveals that at 4:42:29 a.m., Officer Offenbacher asks the defendant if he has a permit to carry the handgun in the console and whether he was aware that it was unlawful to carry a handgun without a permit. At 4:44:10 a.m., the defendant tells him that they can take the guns and that he will get them tomorrow. At 4:51:10 a.m., the defendant is told that he is being arrested for unlawful possession of a weapon.

On cross-examination, Officer Offenbacher testified that although he could not recall whether the police had been called to the Lakewood Apartments the preceding evening, he was not responding to a specific call that morning. He said that he was on standard patrol and did not necessarily stay within his beat area but patrolled all of the "short east area." The officer also

confirmed that he had no prior experience with the defendant or his car. He acknowledged that a number of people live in that apartment building and that he does not know all of them. Offenbacher agreed that he first saw the vehicle being driven by the defendant in the parking lot of the apartments. He agreed that the entrance to the parking lot from Magnolia is only one-car wide and that the alley behind the apartments is an easy way to exit the parking lot. He also agreed that the parking lot is private property. The officer confirmed that two people were standing by the street when he arrived at the apartments, neither of which were the defendant, his passenger, or "G." The officer did not know if Mr. Wright lived at the apartments and did not recall seeing this car there before.

Officer Offenbacher testified that when he first observed the man putting something in the trunk of the car the defendant was driving, he was not sure what was being loaded in the trunk and admits that it could have been a number of things besides a rifle. He said it had been raining earlier that morning but was not raining at that time. He said that when he pulled around to the alley, he saw a man, whom the defendant later identified as "G," walking from the car. He said that once he drove down the alley and slowed his cruiser as the man came along side it, the man jogged or walked away quickly. The officer stated that he had seen the man before in that area but did not think that he had ever arrested him.

Officer Offenbacher acknowledged that the tape shows the car's lights being illuminated "a short distance" after the car drives off in the alleyway. He also confirmed that the defendant stopped immediately once he signaled for the defendant to stop and that the defendant immediately stuck out his hands with a wallet or some other object in them. Furthermore, the defendant gave the officer his driver's license and registration fairly quickly. The officer said that

when asked what he was doing at "Krystal Heights," the defendant said he was visiting his sister. The officer agreed that the defendant's sister later came to the scene to take the defendant's car.

The officer testified that the defendant told him that his passenger was a friend, whom he was driving home. He acknowledged that he next asked the defendant what the man placed in his trunk. The officer confirmed that he never told the defendant that he had pulled the defendant over for a traffic violation and that he never issued a citation for a traffic violation with respect to the stop. He said he patted down the defendant even though the defendant had told him that he had no weapons on him. The officer confirmed that up to that point, the defendant had been cooperative, compliant, and responsive. He also acknowledged that another officer was there. He agreed that he had no facts regarding the defendant being involved in "drug trafficking." He said that he was unsure of whether the car was stolen because it was not registered to the defendant and had Florida tags. He agreed that the defendant later told him that the car was registered to his mother.

The officer admitted that a criminal complaint was issued charging the defendant with unlawful possession of a handgun and that this charge did not arise until after the handgun was found. He said he believed that it was legal to own an assault rifle. The officer admitted that he did not ask the defendant if he could open the trunk or search the car. He agreed that the defendant only said it was okay to check the serial numbers on the gun. He also said that he asked the defendant if he was a convicted felon, while the defendant was outside the car. The officer stated that Officer Taylor was searching the car while he looked in the trunk and that Taylor searched the car twice before he found the gun in the center console. He agreed that the passenger was asked if she had any drugs or used drugs.

11

Officer Offenbacher acknowledged that the defendant was not given the <u>Miranda</u> warnings at any point during the videotape of the stop. He agreed that the defendant was not free to continue driving once he activated his blue lights and was not free to leave the scene once he got out of his car, pending the officer's investigation. He also noted that the initial history check on the defendant did not reveal that he was a convicted felon and that the police did not find this out until a day or two later. Accordingly, he was not initially arrested for being a felon in possession of a firearm. Offenbacher acknowledged that after Officer Taylor found the handgun, he asked the defendant if he had a permit, and the defendant said that he did not. He said that he advised the defendant that he was under arrest for unlawful possession of a handgun several minutes later.

On re-direct examination, Officer Offenbacher testified that his attention was initially drawn to the defendant's car because an unfamiliar female was going to an unfamiliar car in a high crime area known for prostitution. He said that once the car drove into the alleyway, he saw a man carrying what looked like a rifle. He reiterated that the car traveled a short distance down the alley without its lights illuminated. Offenbacher noted that the car had Florida tags and stated that Florida was a source area for drugs. With regard to the frisk, the officer acknowledged that he could not remove any and all things from an individual's pocket during a <u>Terry</u> frisk, including, for example, keys. He said that, as a result, he was aware that the defendant could have opened the trunk with a key fob and had access to the rifle.

On recross-examination, Officer Offenbacher testified that he did not know the woman in the parking lot and did not know whether she was committing any crimes. Furthermore, he did not know the defendant's car and had no reason to believe that it was involved in criminal activity when he first noticed it. Finally, he noted that a number of states and areas are source areas

12

for drugs. He agreed that a Florida license tag alone does not make it more likely that a vehicle is involved in drug trafficking.

## II. FINDINGS OF FACT

The Court makes its factual findings in the analysis section of the report.

## III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The defendant contends that his rights under the Fourth Amendment were violated because the officer had no basis to stop his vehicle or subsequently to search his person or his car. Specifically, he argues that (1) the officer had neither probable cause nor reasonable suspicion to stop him on January 12, 2005; (2) once he was stopped, the officer had no basis to continue to detain him or to frisk him, and (3) no exception to the warrant requirement permitted the search of his car. Finally, he asserts that (4) because he was never given the Miranda warnings, all of his statements should be suppressed. The Court will examine each of these contentions in turn.

### A. Propriety of the Stop

The first issue the Court must address is whether Officer Offenbacher properly stopped the defendant's vehicle on January 12, 2005. The government contends that the officer had probable cause to stop the defendant for a traffic violation, that of driving without his headlights illuminated. It also maintains that absent probable cause, the officer had a reasonable suspicion that the defendant was involved in criminal activity.

13

*1. Probable Cause*

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. Id. at 388. Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. Ferguson, 8 F.3d at 392 (citing Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983)). If a traffic stop is properly supported by probable cause, "it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop." Id. at 391.

The Court makes the following findings of fact with regard to the stop in the present case: Officer Offenbacher saw the defendant's car travel through the parking lot of the Lakewood Apartments and onto an alley behind the apartment building. The car's lights were not illuminated during this time. The officer drove onto Hembree Street, from which he could see the car stopped in the alley. He described the alley as a public alley with speed limit signs posted thereon. As Officer Offenbacher drove on the alley toward the car, he saw it travel a "short distance" of approximately twenty (20) to thirty (30) feet down the alley without its lights illuminated. Then the driver turned on the car's lights and continued onto Harrison Street.

14

The defendant argues that Offenbacher lacked probable cause to stop the defendant because no statute or ordinance requires the use of headlights on private property and because the defendant activated his headlights within seconds of proceeding down the alley. He maintains that it is unreasonable to stop the defendant for driving on the alley without his headlights activated for this very short distance because the officer acknowledged that the alley was well lit. The government contends that the officer properly stopped the defendant for a traffic violation, that is operating a motor vehicle at night without headlights.

Tennessee law requires, in pertinent part, that the headlights of all motor vehicles "be displayed during the period from one-half (½) hour after sunset to one-half (½) hour before sunrise." Tenn. Code Ann. § 55-9-406(a). A violation of this provision is a Class C misdemeanor. Tenn. Code Ann. § 55-9-406(b). Section 17-379(a)(1) of the Knoxville City Code mandates that "[e]very motor vehicle" be equipped with at least two and no more than four headlights. The time during which such headlights must be illuminated is identical to the state requirement of one-half hour before sunset until one-half hour before sunrise. Knoxville City Code §§ 17-377(a), 17-378(a). The Court finds that the defendant's vehicle was driving just before 4:30 a.m. on January 12, 2005. The Court takes judicial notice of the fact that 4:30 a.m. is prior to one-half hour before sunrise in January. Accordingly, the Court finds that both state and city law required the defendant to have his headlights illuminated while driving at this time.

The defendant argues that because he was initially driving on private property–the parking lot of the apartments–the laws requiring the use of headlights do not apply. The language of the Tennessee statute does not restrict its application to vehicles traveling on state roads or highways or upon the public roads. See Tenn. Code Ann. § 55-9-406. Accordingly, the Court

15

questions the relevance of the parking lot being private property. The Knoxville City Code, on the other hand, requires compliance with the lighting requirements of the Code for vehicles "driven or moved on any highway." Knoxville City Code § 17-376(a). The section which gives the time during which lights must be operational for all vehicles, specifies its application (albeit for vehicles other than motor vehicles) "when traveling upon a state highway, state aid road or other road, highway or street under the control of the state, the federal government or the city dedicated, appropriated or open to public use or travel." Knoxville City Code § 17-378(a); see also id. at § 17-377(a). Thus, the Court finds that at the very least, the defendant had to have his lights illuminated when he drove upon the alley located behind the apartment building, which the Court finds to be an alleyway in the city open to public use or travel as evidenced by the presence of speed limit signs.

The defendant argues that he only drove without his headlights for few seconds and, thus, it was unreasonable for Officer Offenbacher to stop him for this. Excluding the time that the defendant drove through the parking lot, the Court finds that the defendant drove without his headlights for a short time while turning onto the alley from the parking lot and then again for approximately two seconds on the alley. When determining the existence of probable cause to stop for a traffic violation, courts

> focus not on whether a reasonable officer "would" have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred), or whether any officer "could" have stopped the suspect (because a traffic violation had in fact occurred), but on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop. The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop. It is

16

> also irrelevant whether the stop in question is
> sufficiently ordinary or routine according to the
> general practice of the police department or the
> particular officer making the stop.

Ferguson, 8 F.3d at 391. At the time Officer Offenbacher stopped the defendant, he knew that the defendant had driven his car on a public alley without the headlights illuminated. Thus, the Court finds that Offenbacher had probable cause to stop the defendant.[3]


*2. Reasonable Suspicion*

In the event that the District Court disagrees with this Court's finding that Officer Offenbacher had probable cause to stop the defendant for a traffic violation, the Court will also analyze whether the officer had reasonable suspicion aside from the traffic violation warranting the stop. A police officer may briefly detain an individual on less than probable cause: "[A] brief investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations omitted). Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. Martin, 289 F.3d at 396. If the

---

[3]The Court also notes that a stop of a vehicle based upon the vehicle's traveling a short distance without headlights has been upheld as a violation of the state statute requiring headlights. See Effler v. State, 508 S.W.2d 809, 811 (Tenn. Crim. App. 1974). In Effler, officers observed a violation of the state headlight requirement when they saw a car, which did not have its headlights illuminated and which was stopped crosswise in the road, begin backing up toward a field. Id.

suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. Id. at 397.

The Court makes the following additional factual findings with regard to the stop: At 4:26 a.m. on January 12, 2005, Officer Offenbacher was parked by the Lakewood Apartments, which he described as being in a high-crime area known for drug activity, prostitution, and violent crimes. He saw a white female walk from the apartment building to a car in the parking lot and enter the passenger's side of the car, which the officer had not seen at those apartments before. His attention was initially drawn to the car because an unfamiliar female was going to an unfamiliar car in a high crime area known for prostitution. He then observed the car drive through the parking lot and toward the rear of the apartment building without its headlights illuminated. He noted that it was dark and had been raining earlier that morning. He pulled onto Hembree Street, where he regained sight of the car, which was stopped behind the apartment building. Officer Offenbacher saw the white female get out of the car and open the trunk. He then saw a black male, carrying a long, tubular bundle, which looked like a rifle, walk up to the trunk and place the bundle inside. Offenbacher believed the item was a rifle because of the way in which the person was carrying it.

The Court also finds that Officer Offenbacher then turned on his headlights and turned into the alley. The white female closed the trunk and got back into the car. The black male started walking away from the car. As Offenbacher drove toward the car, it began proceeding down the alley again without its headlights illuminated. After twenty or thirty feet, the driver illuminated the headlights. As Officer Offenbacher came alongside the black male, the individual jogged or walked away quickly. The officer followed the car, which turned onto Harrison Street. The videotape reveals that once the car turned, the officer stopped it approximately twelve seconds later.

18

The Court assesses the reasonableness of the officer's suspicion in light of the totality of the circumstances surrounding the stop. <u>See</u> <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002); <u>Martin</u>, 289 F.3d at 398. Although an officer may not rely upon a mere hunch to support a <u>Terry</u> stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." <u>Arvizu</u>, 534 U.S. at 274. Initially, the Court notes that after the female passenger entered the car, the car drove to the rear of the apartment building without its headlights illuminated, despite it being dark out. The officer next saw the passenger open the car's trunk, another individual load what he believed was a rifle in the trunk, and the car begin to drive away, again without its headlights illuminated. The Court finds the fact that the loading of the item was preceded and followed by the car traveling without its headlights illuminated indicates that the occupants of the vehicle did not want to be seen. The fact that the vehicle pulled behind the apartment building for the loading strengthens this conclusion. "[E]vasive behavior is a pertinent factor in determining reasonable suspicion." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000).

The Court also notes the fact that the black male, who loaded the item, jogged away from the officer, after the officer turned on his headlights and proceeded down the alley, adds to the suspiciousness of the circumstances. In <u>Wardlow</u>, the Supreme Court found that unprovoked flight upon spotting the police contributes to reasonable suspicion. <u>Id.</u> Thus, the Court finds that the mounting evasive behavior–driving to the rear of the building with the lights off, loading in the rear of the building, driving away with lights off, and the loader leaving at a quick pace once the officer drew near–could provide the officer with specific, articulable facts that the occupants of the car were engaged in a drug transaction or perhaps a weapons offense.

19

Additionally, the Court observes that the entire transaction took place in the early morning in a high crime area. Specifically, Officer Offenbacher testified that the 2700 block was known for drug activity, prostitution, and a high incidence of violent crimes, especially gun crimes, and that police officers are called to the Lakewood Apartments "constantly." "The fact that a given local is well known for criminal activity will not by *itself* justify a Terry stop; but it is among the various factors that officers may take into account." Martin, 289 F.3d at 397; see also Wardlow, 528 U.S. at 124 (observing that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation); Watkins v. City of Southfield, 221 F.3d 883, 888-89 (6th Cir. 2000). The lateness of the hour in combination with the area's reputation as a locale for criminal activity can contribute to reasonable suspicion. See, e.g., United States v. Bailey, 302 F.3d 652, 659 (6th Cir. 2002) (examining a stop at 1:00 a.m. in an area known for criminal activity). The Court finds that the timing and location of these events, while alone not enough to generate reasonable suspicion, adds to the circumstances such to create a specific and articulable facts supporting a reasonable suspicion.

The defendant argues that Officer Offenbacher's observations amounted to no more than a hunch because the officer was not sure that the item the black male placed in the car was a rifle and because there is nothing illegal about possession of a rifle. He also argues that many of the surrounding facts, such as the fact that the defendant's car had a Florida license plate and the fact that the officer, who admitted that he did not know everyone who lived at the apartment building, was unfamiliar with the defendant's passenger and his car, are merely innocent facts. The court notes that facts innocent in and of themselves can contribute to reasonable suspicion. See Arvizu, 534 U.S. at 273 (holding that seemingly innocent information can provide a basis for reasonable

20

suspicion in light of an officer's training and experience). Moreover, the Court finds from the facts articulated that it was the increasingly evasive manner of the loading rather than merely Offenbacher's belief that the item was a rifle that, along with the time and characteristics of the area and the actions of the defendant, provided reasonable suspicion that criminal activity was afoot. Accordingly, the Court finds based on the totality of the circumstances, including the information known to the officer as set forth above along with reasonable inferences that could be drawn at the time of the stop, that the officer had reasonable, objective suspicion to stop the defendant.

## B. Propriety of the Detention and Frisk

The defendant also contends that once he was stopped, he was illegally detained beyond the scope of the traffic stop because the officer questioned him extensively about matters unrelated to the traffic stop. He also contends that the officer did not have the requisite reasonable suspicion to frisk him. The government contends that the officer's questions were designed to confirm or dispel his suspicions quickly and did not convert the stop into an illegal detention. It also argues that the officer could properly frisk the defendant based upon his reasonable belief that he needed to do so for officer safety.

*1. Scope of the Detention*

The defendant argues that his Fourth Amendment rights were violated when Officer Offenbacher questioned him about the item in the trunk, whether he had any weapons on his person, whether he was a convicted felon, and whether the rifle was stolen. He argues that the officer never began filling out a traffic citation. Thus, he maintains that he was subjected to intensive questioning

21

outside of the scope of the traffic offense, which rendered his detention illegal. He asserts that his responses to these questions and all evidence stemming therefrom should be suppressed as "fruit of the poisonous tree."

The Court finds the following facts based upon Officer Offenbacher's testimony and the Court's review of the videotape from the officer's patrol car: Officer Offenbacher stopped the defendant at 4:28:43 a.m. The officer approached the car at 4:29:34 a.m. and asked for the defendant's driver's license and registration. The defendant complied, and the officer asked if the address on the license is correct and whether he lived in Green Hills. The defendant confirmed that he lived in Green Hills, and Offenbacher asked what brought him to that area. The defendant replied that he was visiting his sister. Offenbacher asked who the passenger was, and the defendant said that his passenger was a friend whom he was giving a ride home. Offenbacher then asked the defendant what the man put in his trunk, and the defendant told him it was a hunting rifle. When asked why he pulled behind the building to retrieve it, the defendant said that he was asked to do so. The defendant was asked about and denied having any weapons on him. At 4:30:59 a.m., Officer Offenbacher asked the defendant to step out of the car and subsequently frisked him. The time from the officer approaching the car to the defendant getting out of the car was just under one and one-half minutes. After frisking the defendant and finding the ammunition, the officer asked if the defendant was a convicted felon, which the defendant denied, and asked if he could look at the rifle.

An officer who stops a person for a traffic violation based upon probable cause can detain the person while he or she completes a records check and issues a citation. See United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999). "[O]nce a motor vehicle has been lawfully detained

for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Pennsylvania v. Mimms, 434 U.S. 106, 111 & n.6 (1977); United States v. Burton, 334 F.3d 514, 519 (6th Cir. 2003). The officer may also ask the defendant questions, as long as those questions are reasonable under the circumstances:

> "Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the public--for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspects' consent.

Id. at 518 (quoting with approval United States v. Childs, 277 F.3d 947, 954 (7th Cir.) (en banc), cert. denied, 537 U.S. 829 (2002)). In this respect, the Sixth Circuit has upheld a defendant's consent to search his car pursuant to the officer's questioning following a stop for a parking violation. Id. The court noted that a few questions about the presence of illegal substances in the car were not unreasonable in light of the traffic stop in a high-crime area at night. Id.; see also United States v. Garrido-Santana, 360 F.3d 565, 574-75 (6th Cir. 2004) (holding that an officer's questioning of an individual detained pursuant to a traffic stop does not violate the Fourth Amendment as long as the questions do not unduly prolong the stop beyond its original purpose).

The Court finds that Officer Offenbacher's questions were primarily related to the loading incident in the alley, which he was investigating, and did not unduly prolong the traffic stop as they lasted around one and one-half minutes. Accordingly, the Court finds the officer's questions were reasonable under the circumstances, especially in light of the officer's suspicions regarding the

recent loading incident and the high crime nature of the area, and did not improperly exceed the purpose of the stop.[4]

### 2. Frisk of the Defendant's Person

The defendant argues that the frisk of his person was improper because the officer had no reasonable belief that he was armed and dangerous. Specifically, he argues that there were two officers on the scene, he was cooperative during the stop, and the rifle in the trunk was not accessible to him or his passenger. Thus, he concludes that the ammunition found in his pocket must be suppressed along with all evidence stemming therefrom, including the handgun found in the car. The government contends that the officer had a valid basis to frisk the defendant because the police were dealing with two suspects in a high crime area in the dark and because the defendant had acknowledged that a firearm was present.

An individual stopped for a traffic violation may be frisked for weapons if a reasonable person would conclude that the detainee "might be armed and presently dangerous" based upon the circumstances known at the time. Mimms, 434 U.S. at 111-112; see also Michigan v. Long, 463 U.S. 1032, 1048 (1983). "The focus of judicial inquiry is whether the officer reasonably perceived the subject of a frisk as potentially dangerous, not whether he 'had an indication' that the defendant was in fact armed." United States v. Bell, 762 F.2d 495, 500 n.7 (6th Cir. 1985), see also United States v. Thomas, No. 04-5872, 2005 WL _____ (6th Cir. Aug. 3, 2005) (holding fact that officer had seen the defendant throw an object that appeared to be a gun did

---

[4]Furthermore, the Court notes that if the stop is deemed a Terry stop rather than a traffic stop, the officer could permissibly question the defendant in order to obtain information to confirm or dispel his suspicions. See Berkemer v. McCarty, 468 U.S. 420, 439 (1984).

not preclude the defendant from having additional weapons on his person).   In the present case,

Officer Offenbacher had seen an individual place what he believed was a rifle into the trunk of the

defendant's car.  The Court notes that the defendant was standing outside of his car at the time he

was frisked by the officer and, at that moment, was unable to reach the rifle.  Nevertheless, the

defendant's admission of the presence of the weapon in the trunk along with the circumstances

surrounding its loading (in the dark, behind the apartment building, etc.) gave the officer a

reasonable basis to believe and arguably increased the potential that the defendant might be

otherwise armed.[5]

Moreover, the fact that the rifle could have been legally possessed does not alter the

reasonableness of the officer's suspicion:  "The purpose of this limited [Terry] search is not to

discover evidence of crime, but to allow the officer to pursue his investigation without fear of

violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not

carrying" the weapon in question is a violation of law.  Adams v. Williams, 407 U.S. 143, 146

(1972); see also Long, 463 U.S. at 1052 n.16 (rejecting the view that the validity of the Terry frisk

turns upon whether the possession of a weapon is legal).  Finally, the fact that there were two

---

[5]Although not binding authority, an unpublished Seventh Circuit case contains similar facts. See, e.g., United States v. Hoard, No. 92-3205,1993 WL 473690 (7th Cir. Nov. 17, 1993).  In that case, the defendant was frisked while standing ten to fifteen feet away from a car's open trunk, containing weapons.  Id. at *1.  The officer knew that the defendant had not been involved in purchasing the weapons or placing them in the trunk but suspected that he might be receiving the weapons from others involved.  Id.  The court held that the defendant's apparent association with the impending weapons transaction and proximity to the trunk helped justify the officer's belief that he could be armed.  Id. at *5.  "[W]here the police reasonably suspect that an illegal arms transaction is about to take place and know that firearms are present, it is not unreasonable for them to be concerned for their safety."  Id. at 6.  Similarly, in the present case, Officer Offenbacher reasonably suspected that criminal activity was afoot involving the placement of the rifle in the trunk and the defendant was in close proximity to the trunk.

25

suspects to the two officers and that the stop occurred in a high crime area, particularly known for gun crimes, further supports the reasonableness of the officer's belief that the defendant might be armed and dangerous. Accordingly, the Court finds that the officer properly frisked the defendant for weapons. The Court also finds that, in any event, the ammunition in the defendant's pocket would have been inevitably discovered in a search of his person incident to his subsequent arrest. See Nix v. Williams, 467 U.S. 431, 443-44 (1984) (holding that improperly seized evidence is admissible if it would have been inevitably discovered by valid means); United States v. Kennedy, 61 F.3d 494, 497-98 (6th Cir. 1995); see also Thomas, No. 04-5872 (holding that bullets discovered during frisk of defendant would have been inevitably discovered during search incident to arrest).

## C. Propriety of the Automobile Search

At the June 30 hearing, the defendant argued that he did not consent to the officer's search of his trunk. He maintained that he only agreed that the officer could check to see if the rifle was stolen, not to the officer looking in the trunk. Additionally, he contends that Officer Taylor's second search of the interior of the car, during which he discovered the handgun, exceeded the scope of a Terry search for officer safety. The government argues that the defendant's consenting to the officer looking at the serial number on the rifle was necessarily consent to open the trunk to look at the rifle. Also, it asserts that the handgun was properly discovered pursuant to the automobile exception to the warrant requirement or during a Terry search of the car's interior.

The Court finds the following facts relating to the search of the defendant's car: After Officer Offenbacher frisked the defendant and discovered ammunition on his person that was inconsistent with the rifle, he asked the defendant about the person from whom he got the gun. He

26

then asked if the defendant objected to one of the officers pulling the rifle out and checking it. The defendant asked why he wanted to look at it. Offenbacher said to see if it was stolen. The defendant said he did not care if the officer read the numbers on it. Offenbacher secured the defendant in his patrol car and then asked the defendant's passenger to step out of the car. He frisked her for weapons, finding a razor blade-like item in her pocket. He asked her to stand aside, and he opened the trunk to get the serial number from the rifle. While Offenbacher was investigating the rifle, Officer Taylor searched the interior of the car. The videotape reveals that after searching the car, Taylor talked with Offenbacher about the rifle and said that he had not found anything in the car but was about to check the backseat. Taylor then took the passenger behind the patrol car. Taylor then searched inside the car again, looking beneath the seats. When he searched the front seat area of the car again, he found a handgun in the console. After finding the gun, Taylor told Offenbacher that the console was the last place he looked.

*1. Search of the Trunk*

"It is well-established that a warrantless search by law enforcement officials will be upheld if a detainee has voluntarily consented to the search." United States v. Van Shutters, 163 F.3d 331, 335 (6th Cir. 1998) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219, (1973)). The government bears the burden of proving that the consent was voluntary and not "the result of coercion, duress, or submission to a claim of authority" based upon the totality of the circumstances. Id. The government must make this showing through "clear and positive testimony" and to a preponderance of the evidence. United States v. Worley, 193 F.3d 380, 385 (6th Cir. 1999).

The defendant's argument regarding the search of the trunk is essentially an argument regarding the scope of his consent. He does not contend that his consent was involuntary but, instead, argues that it only extended to the serial number on the rifle. Thus, at the hearing, he maintained that the officer should have allowed him to open the trunk and retrieve the number from the rifle.

> When law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search. Florida v. Jimeno, 500 U.S. 248, 251-52 . . . (1991). The standard for measuring the scope of the consent given is objective reasonableness–"what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Id. at 251[.]

United States v. Gant, 112 F.3d 239, 242 (6th Cir. 1997). In the present case, the Court finds that a reasonable person, upon hearing the defendant say that he could look at the serial numbers on the rifle, would have believed that he could open the trunk in order to look at the rifle and check the serial number. Accordingly, the Court finds that Offenbacher's search of the trunk for the rifle was within the scope of the defendant's consent.

2. *Search of the Car's Interior.*

The government contends that Officer Taylor properly searched the interior of the defendant's car under the automobile exception to the warrant requirement and as a protective search under the Terry doctrine. When "police have probable cause to believe that a vehicle contains contraband, they may search the entire vehicle and any contents located within it." United States v. Mans, 999 F.2d 966, 969 (6th Cir.), cert. denied, 510 U.S. 999 (1993); see also California v.

<u>Acevedo</u>, 500 U.S. 585, 580 (1991); <u>United States v. Lumpkin</u>, 159 F.3d 983, 986 (6th Cir. 1998). The mobility of an automobile as well as the reduced expectation of privacy stemming from the fact that automobiles are highly regulated gives rise to this automobile exception to the warrant requirement. <u>Pennsylvania v. Labron</u>, 518 U.S. 938, 940 (1996). As long as the automobile is mobile and police have probable cause to believe that the automobile contains evidence of the crime, no exigent circumstances need be present. <u>Id.</u>; <u>see also</u> <u>Maryland v. Dyson</u>, 527 U.S. 465, 466-67 (1999); <u>United States v. Cope</u>, 312 F.3d 757, 775 (6th Cir. 2002).

The government argues that once the officers found the ammunition in the defendant's pocket, combined with the other facts known at that point, they had probable cause to search the car. The Court disagrees. Although the finding of ammunition that did not go to a rifle could cause the officers reasonably to suspect that the gun using that ammunition might be in the car, the finding of the ammunition did not raise a substantial likelihood that the car would contain *contraband*. At no point during the stop did the officers know that the defendant was a convicted felon. Moreover, the defendant did not admit that he did not have a permit for the handgun until after its discovery. Thus, the Court finds that the automobile exception does not apply in this case.

Under certain circumstances, police may search a car for their own protection incident to a <u>Terry</u> stop:

> T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

Long, 463 U.S. at 1049 (quoting Terry, 392 U.S. at 21); Boone v. Spurgess, 385 F.3d 923, 929 (6th Cir. 2004) (noting that the protective search of an automobile is an extension of the frisk rule announced in Terry). Such a protective or Terry search of a car is permissible if a reasonable person would believe that his or another's safety is at risk. Long, 463 U.S. at 1049. Additionally, a Terry search of an automobile is not dependent upon an officer's detention of an armed suspect: "The 'patdown' of a vehicle need not be predicated on the discovery of a weapon on a suspect's person." United States v. Slater, No. 95-5223, 1996 WL 143460, *3 (6th Cir. Mar. 28, 1996) (holding it reasonable for an officer to conduct a Terry search of the defendant's car, even though a frisk of his person revealed no weapons).

In the present case, the Court finds that Taylor could properly conduct a Terry search of the defendant's car. As discussed above with regard to the frisk of the defendant's person, Offenbacher saw the suspicious circumstances in which the rifle was loaded into the trunk. Offenbacher told Taylor about these observations prior to his search of the car. More importantly, the defendant admitted that there was a rifle in the trunk, and the officers found ammunition in the defendant's pocket that did not go to the rifle. See Long, 463 U.S. at 1050 (observing fact that officers knew there was a large knife in the defendant's car was a fact supporting reasonable suspicion for a Terry search of the car). The presence of one weapon, plus the additional presence of ammunition related to another weapon, would justify the officers' concern for their safety and subsequent Terry search of the car based upon the fact that there could be additional weapons in the car. See United States v. Christian, 187 F.3d 663, 669 (D.C. Cir. 1999) (reasoning that "the presence of one weapon may justifiably arouse concern that there may be more in the vicinity"). In fact, the officers could reasonably infer that the defendant had ammunition in his pocket for the purpose of

going armed, thereby indicating the presence of a firearm that would use that ammunition in close proximity to the defendant. Finally, the stop was taking place in the dark in an area known for gun crimes. See Long, 463 U.S. at 1050 (holding that the lateness of the hour along with the isolated location contributed to the officer's reasonable belief that the defendant posed a danger). The Court finds that the combination of these circumstances provided Taylor with specific and articulable facts supporting a reasonable suspicion that the defendant could gain access to a weapon in the car's interior.

The fact that the defendant was detained in Officer Offenbacher's patrol car during the Terry search of the car does not negate the basis for the protective search. The Long Court recognized that during an investigative detention,

> [j]ust as a Terry suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a Terry suspect [detained by his car] break away from police control and retrieve a weapon from his automobile. In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside. Or, [as in Long], the suspect may be permitted to reenter the vehicle before the Terry investigation is over, and again, may have access to weapons.

Long, 463 U.S. at 1051-52 (citations omitted). Relying upon this analysis from Long, the Sixth Circuit has held that officers could properly conduct a Terry, protective search of a defendant's car despite the fact that the defendant was detained in the backseat of the police car at the time. See United States v. Terrell, 95 Fed. Appx. 746, 748 (6th Cir.), cert. denied 124 S. Ct. 2860 (2004).

The defendant argues that Officer Taylor found the handgun only after conducting a "second search" of the car and that this second search was beyond the scope of a Terry search.

31

The Court finds that Taylor began searching the defendant's car at 4:36:27 a.m. He searches both the front- and rear-seat areas on both sides of the vehicle. At 4:38:12 a.m., Taylor talked with Officer Offenbacher about the rifle. Taylor told Offenbacher that he had not found anything in the car but that he was getting ready to look in the backseat. Taylor then escorted the passenger behind the patrol car. At 4:39:32 a.m., Taylor again looked in the defendant's car, this time appearing to search beneath the seats. He announced that he had found the handgun at 4:41:25 a.m. After Taylor found the gun, he told Offenbacher, who had remarked that the gun was in an obvious place, that the console was the last place that Taylor searched.

The Court finds that the entire time Taylor was examining the car lasted only five minutes and was interrupted by his discussion with Offenbacher about the rifle and his moving the passenger. Moreover, Taylor's statements about intending to check the backseat and, later, that the console was the last place he looked, suggest that the search of the car was not complete when he stopped to talk with Offenbacher and move the passenger. Finally, Taylor found the handgun in the center console of the car, a location within easy reach of the driver and, therefore, clearly within the scope of a Terry protective search. Thus, the Court finds that Taylor essentially conducted a single Terry search and properly found the handgun pursuant thereto.

### D. Admissibility of the Defendant's Statements

The defendant contends that the use of the statements he made during the January 12, 2005 stop of his car would violate the Fifth Amendment because he was questioned while in custody and without being advised of the Miranda warnings. He argues that he was in custody during the questioning because (1) the questioning was designed to elicit incriminating responses and went

32

beyond the scope of the traffic violation and (2) because he was frisked and detained while being questioned. The government contends that the <u>Miranda</u> warnings were not required because the defendant was not in custody before he was told that he was being arrested.

The Court finds the following facts occurred with respect to questioning of and statements made by the defendant during the stop: After requesting and receiving the defendant's driver's license, Offenbacher first asked why the defendant had been at the apartment building and then began to question him about the rifle Offenbacher had seen a black male place in the defendant's trunk. The defendant admitted it was a hunting rifle and stated that he was asked to pull behind the apartments to pick it up. Offenbacher asked the defendant if he had any weapons on him, which the defendant denied, and then asked the defendant to step from the car and frisked him. One and one-half minutes elapsed from the time Offenbacher approached the defendant's car until the point that the defendant got out of his car.

The Court also finds that after frisking the defendant and finding ammunition that was inconsistent with a rifle in the defendant's pocket, Officer Offenbacher questioned the defendant about the person from whom he got the rifle. He asked the defendant if the defendant objected to an officer pulling out the rifle and checking it. The defendant asked the officer why he wanted to look at the rifle, and Offenbacher said to see if it was stolen. The defendant stated that he did not care if Offenbacher read the numbers on the rifle. Offenbacher then secured the defendant in his patrol car. The videotape reveals that just over one and one-half minutes elapsed from the time the officer frisked the defendant until the time he placed the defendant in the patrol car.

The Court finds that once Offenbacher secured the defendant in the cruiser, he told Officer Taylor what he had seen in the alley. The officers asked the passenger to step out of the car,

33

questioned her about whether she had weapons or drugs, and frisked her, finding a razor blade-like item in her pocket. She was asked to stand aside. Offenbacher next opened the car's trunk and examined the rifle which he identified as an SKS. He reported the rifle's serial number to records on his radio. Officer Taylor began searching the interior of the car, and Officer Offenbacher radioed the defendant's driver's license number to records, requesting a history check on the defendant.

The Court finds that about seven minutes after placing the defendant in the cruiser, Offenbacher returned to the police car and questioned the defendant about what he was planning to do with the rifle. The defendant said that he was going hunting on a friend's ranch. The officer then asked the defendant if he commonly has someone throw a gun in his car's trunk and noted that the rifle was loaded. Offenbacher asked the defendant about the gun to which the ammunition from the defendant's pocket was related. The defendant stated that the ammunition was for a gun at his residence. Pursuant to additional questioning, the defendant identified the person who placed the gun in his trunk as "G." Offenbacher had been talking with the defendant for about two minutes when Taylor announced that he had found the gun.

The Court finds that Officer Offenbacher looked at the gun in the car's console. About one minute after Taylor found the gun, Offenbacher asked the defendant whether he had a permit for the handgun in the console and whether he was aware that it is unlawful to carry a handgun without a permit. After additional questioning about the circumstances surrounding the defendant's receiving the rifle, the defendant told Offenbacher that the officers could take the guns and that he would get them tomorrow. Offenbacher continued to talk with the defendant intermittently, and just under ten minutes from the point that Taylor found the handgun, Offenbacher told the defendant he was arresting him for unlawful possession of a weapon. The Court finds that

34

Offenbacher's questioning of the defendant consumed about fifteen minutes of the approximately twenty-four minutes elapsing from the point the officer approached the defendant after stopping him until the defendant was told he was under arrest.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself."  In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79 (1966); <u>see also</u> <u>United States v. Salvo</u>, 133 F.3d 943, 948 (6th Cir. 1998).  "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994); <u>Salvo</u>, 133 F.3d at 948.

Although persons detained pursuant to a traffic stop are seized within the meaning of the Fourth Amendment, the dangers inherent in custodial questioning are not present in the ordinary traffic stop because (1) the person's detention "is presumptively temporary and brief" and (2) the atmosphere is "substantially less police-dominated" in that the stop occurs in public and the person is typically confronted by only one or two officers.  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 4336-39 (1984).  In this respect, the Supreme Court has deemed a traffic stop to be more analogous to an investigatory stop than a formal arrest.  <u>Id.</u> at 439.  On the other hand, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by <u>Miranda</u>." <u>Id.</u> at 440.  With respect to investigatory detentions,

> [t]he very nature of a <u>Terry</u> stop means that a detainee
> is not free to leave during the investigation, yet is not
> entitled to <u>Miranda</u> rights.  <u>Berkemer v. McCarty</u>, 468
> U.S. 420, 439-41 . . . (1984).  Therefore, the pertinent

> question is whether [the defendant] was "in custody"
> during the investigatory detention for the purposes of
> determining whether his Fifth Amendment rights
> were violated.

United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003). The "ultimate inquiry is simply

whether there is a formal arrest or restraint on freedom of movement of the degree associated with

a formal arrest." Id. (quoting United States v. Knox, 839 F.2d 285, 291 (6th Cir.1988)).

In the present case, the Court has found that the defendant was properly seized and

detained pursuant to a traffic stop or, alternatively, that he was properly detained pursuant to a Terry

stop. The Court must now consider whether this seizure approached the custodial circumstances of

a formal arrest at any time during which Officer Offenbacher was questioning the defendant. In

determining whether a defendant was in custody, the Court examines the totality of the

circumstances to ascertain a reasonable person's understanding of the situation. Salvo, 133 F.3d at

948. Relevant to the inquiry is whether a reasonable individual in the same position as the defendant

would have felt free to leave. Swanson, 341 F.3d at 529. Other factors useful in making this

determination are:

> (1) the purpose of the questioning; (2) whether the place of the
> questioning was hostile or coercive; (3) the length of the questioning;
> and (4) other indicia of custody such as whether the suspect was
> informed at the time that the questioning was voluntary or that the
> suspect was free to leave or to request the officers to do so; whether
> the suspect possessed unrestrained freedom of movement during
> questioning; and whether the suspect initiated contact with the police
> or voluntarily admitted the officers to the residence and acquiesced
> to their requests to answer some questions.

Salvo, 133 F.3d at 950; see also Swanson, 341 F.3d at 529.

In the present case, the defendant was detained pursuant to a traffic stop and was not

free to leave. Berkemer, 468 U.S. at 436 (observing that "[c]ertainly few motorists would feel free

36

to leave the scene of a traffic stop without being told they might do so"). The Sixth Circuit has concluded that this factor weighs in favor of the defendant being in custody at the time he made the statement. See Swanson, 341 F.3d at 529 (holding that detention pursuant to a Terry stop weighed in favor of a finding that the defendant was in custody when questioned). Nevertheless, the Court finds that this factor is not entitled to much weight under the circumstances because a defendant detained for a traffic violation would never be free to leave until the traffic stop was concluded. Additionally, the present defendant's comment to Officer Offenbacher that the officers could take the guns and that he would retrieve them tomorrow indicates that the defendant believed that he would be leaving at the conclusion of the stop. This comment was made seven minutes before the defendant was informed that he was under arrest.

The Court finds that the purpose of the officer's questioning of the defendant was initially to investigate the suspicious activity in the alley. Officer Offenbacher testified that as he questioned the defendant, the defendant's answers increased his suspicions that criminal activity was afoot. Although such purpose arguably weighs in favor of a finding that the defendant was in custody, the Court also notes that an officer having reasonable suspicion to stop an individual is permitted to question the person briefly to affirm or dispel his or her suspicions. See Martin, 289 F.3d at 396. In the present case, the Court finds that the questioning generated additional reasonable suspicion in the officer, allowing him to extend permissibly the length of the Terry detention. The fact that the Terry detention was ongoing, means that the seizure had not escalated into a formal arrest.

The Court finds that the location of the questioning supports a finding that the defendant was not in custody. The questioning occurred outside in a in public place. "[E]xposure

37

to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." Berkemer, 468 U.S. at 438. The Sixth Circuit has found the parking lot of a Burger King restaurant, Salvo, 133 F.3d at 951, and outside of a tattoo parlor, Swanson, 341 F.3d at 529, to be non-coercive locations. Similarly, the Court finds that a roadside stop in a residential area near an apartment complex is not coercive. Moreover, only two officers were involved in the stop of the defendant, and only Officer Offenbacher questioned the defendant. The defendant's one-on-one conversations with Offenbacher are more akin to the ordinary traffic stop described by the Supreme Court in Berkemer, 468 U.S. at 438 (noting the fact that the defendant is detained by only one or two officers reduces his or her sense of vulnerability during a stop), or to a Terry investigatory stop than a formal arrest.

       With regard to the length of the questioning, the Court finds that the defendant was questioned for about fifteen minutes, during the approximately twenty-four minutes comprising the stop up to the point the defendant was informed that he was being arrested. Noting the continuing nature of the investigation, the Court finds that the length of the questioning does not support a finding that the defendant was in custody.

       The Court finds that during the bulk of the questioning, the defendant did not have unrestrained freedom of movement in that he was detained in the back of Offenbacher's police car. On the other hand, the Sixth Circuit has held that "[d]etention in a police car does not automatically constitute an arrest." United States v. Bradshaw, 102 F.3d 204, 211 (6th Cir. 1996) (analyzing the defendant's detention under the Fourth Amendment). Moreover, the Court notes that the defendant was not handcuffed. The Sixth Circuit has found that Miranda warnings were not required for a

defendant, detained pursuant to a <u>Terry</u> stop and questioned in a police car on a public street but not handcuffed. <u>Thomas</u>, No. 04-5872. The Court finds that this factor weighs against a finding that the defendant was in custody.

Finally, in the present case, the Court finds that the officers did not expressly tell the defendant that he was not being arrested or that he was free to decline to answer questions. On the other hand, as discussed above, the defendant's comment that he would leave the guns with the officers and pick them up the next day indicates that the defendant did not believe that he was under arrest. The Court finds that this factor does not weigh in favor of the detention being considered custodial.

In considering the totality of the circumstances surrounding the defendant's detention and questioning, the Court finds that the circumstances were not custodial or tantamount to the defendant being formally arrested. In light of the stop occurring in a high crime area, the limited number of officers on hand, the presence of a rifle in the trunk, and later the finding of ammunition on the defendant's person, Officer Offenbacher was entitled to frisk the defendant and place him in the patrol car during the stop in order to ensure the officers' safety. This precaution limited the defendant's movement but did not convert the traffic stop into a formal arrest. Thus, in light of all the circumstances surrounding the traffic stop, particularly the defendant's belief that he would be free to leave at the conclusion of the stop, the Court finds that the defendant was not in custody for purposes of the Fifth Amendment during Officer Offenbacher's questioning of him prior to his being told that he was under arrest. Consequently, the Court finds that the defendant was not entitled to the <u>Miranda</u> warnings prior to answering Offenbacher's questions. The Court recommends that the District Court deny the defendant's request to suppress his statements made following his stop.

## IV. CONCLUSION

For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress Evidence [**Doc. 13**] be **DENIED**.[6]

Respectfully submitted,

　s/ C. Clifford Shirley, Jr.　
United States Magistrate Judge

---

[6]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).